**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ELIASSEN GROUP, LLC and | ) | |
| EG LIFE SCIENCES LLC, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No. _____ |
|  | ) | |
| JAYNE GILL and GLENN HAEGLE, | ) | |
|  | ) | |
| Defendants. | ) | |

## <u>VERIFIED COMPLAINT AND JURY DEMAND</u>

### <u>Introduction</u>

1.      The Plaintiffs, Eliassen Group, LLC ("Eliassen Group" or "EG") and EG Life

Sciences LLC ("EG Life Sciences" or "EGLS") (collectively as "Eliassen"), bring this action

seeking damages and injunctive relief against two former employees, Defendants Jayne Gill

("Ms. Gill"), who worked for Eliassen for over eight (8) years, most recently as Sr. Director,

Client Services, and Glenn Haegle (Mr. Haegle"), who had worked for Eliassen for over two

years, most recently as a Client Services Manager, due to the Defendants' violations of the

confidentiality provisions and the restrictive covenants contained in their respective Employment

Agreements with Eliassen.  Shortly before both Defendants quit their jobs with Eliassen on

February 1, 2019, they made preparations to engage in such misconduct, and after their

departure, they have engaged in such misconduct on behalf of their new employer, a direct

competitor of Eliassen, using confidential Eliassen information to solicit Eliassen clients and

employees, all in violation of their obligations.

Plaintiffs seek legal and equitable relief to prevent the immediate and irreparable harm that has resulted and that will continue to result from the Defendants' wrongful conduct, including injury to Plaintiffs' good will and confidential and/or proprietary business information as well as the financial harm that will result to their business if Defendants' wrongful conduct continues.

## Parties

2.      Eliassen Group, LLC ("Eliassen Group") is a Delaware limited liability company with a principal place of business located at 55 Walkers Brook Drive, 6th Floor, Reading, MA, 01867, in Middlesex County, Massachusetts.  Eliassen Group, LLC is the sole owner and manager of EG Life Sciences LLC, which was formed in 2015 to provide services to customers of Eliassen Group's Life Sciences Division.

3.      EG Life Sciences LLC ("EG Life Sciences" or "EGLS") is a Delaware limited liability company with a principal place of business located at 55 Walkers Brook Drive, 6th Floor, Reading, MA, 01867, in Middlesex County, Massachusetts.

4.      Defendant Jayne Gill ("Ms. Gill") is a former employee of Eliassen Group, LLC with a last known address at 11 Aspen Lane, Bedford, NH 03110.  She worked in Eliassen's prior Massachusetts headquarters in Wakefield until 2017, and then in its Reading headquarters after Eliassen moved in 2017.  Ms. Gill was an employee of Eliassen Group, LLC from the time she was initially hired in August 2010 through the day she resigned on February 1, 2019, and worked in its Life Sciences division beginning shortly after she was first employed with Eliassen Group.

5.      Defendant Glenn Haegle ("Mr. Haegle") is a former Client Service manager in Eliassen's EG Life Science's group with a last known address at 11917 Frost Aster Drive,

Riverview, Florida.  Mr. Haegle was an employee of Eliassen Group, LLC, working in its Life

Sciences division from the time he was initially hired in October 2016 through the day he

resigned on February 1, 2019.

## Jurisdiction and Venue

6.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C.

§1331 over Ms. Gill and Mr. Haegle in the claims asserted against them under Defend Trade

Secrets Act ("DTSA")(Counts III and V respectively).  Additionally, this Court has personal

jurisdiction and diversity subject matter jurisdiction over the two Defendants under the

remaining claims.

Additionally, this Court has diversity jurisdiction over both Ms. Gill and Mr. Haegle.

The matter at issue is well in excess of the diversity threshold of $75,000, exclusive of interest

and costs.  Ms. Gill and Mr. Haegle both have had substantial contacts with Eliassen Group and

EGLS within the Commonwealth of Massachusetts in connection with the performance of their

duties and responsibilities on behalf of Eliassen.  Ms. Gill worked in Eliassen Group and EGLS's

Massachusetts offices during her employment with Eliassen.  Mr. Haegle had substantial

contacts with the EGLS and Eliassen Group in connection with his employment at Eliassen.

Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28

U.S.C. §1332.

## Factual Allegations

**(i)      Eliassen Group's and EG Life Sciences' Business**

7.      Eliassen Group and EG Life Sciences provide Information Technology ("IT")

staffing services and consulting services to corporate clients nationwide by filling positions with

highly qualified employees and independent contractors, referred to by Eliassen Group and

EGLS as "Consultants."  Eliassen Group provides such services to a variety of industries, including financial services, manufacturing, and software development.  EGLS provides such services to medical device, pharmaceutical and biotechnology companies.

8.      As part of its services, EG Life Sciences provides life science staffing and consulting in areas of quality (quality assurance and quality control), regulatory and compliance (regulatory submissions and filing, audit and regulatory observation, and inspection readiness), validation (process, software and equipment), engineering, project management from conception to execution, and biometrics (including statistical programming and analysis, biostatistics, and SDISC consulting and data standardization), among others.

9.      EG Life Sciences shares staffing and recruiting resources, organization, data, processes and techniques with Eliassen Group, using a local and national model of staffing based on telephone contacts and interviews to screen consultants and to place them at clients in biotech, pharmaceutical, and the medical devices industries.

10.      EGLS's technical recruiting organization is composed of career recruiters, averaging approximately ten years of technology recruiting experience, who are invested in the success of the candidates.  Its recruiters often act as career counselors to candidates as they work with the candidates year-over-year, delivering personalized service.

11.      EGLS consistently uses a proprietary recruiting quality management process that includes rigorous telephone screening, in-person interviews for those consultants when possible, reference checking, and further screening services (e.g., security, bonding) as required by the client.

12.      EGLS's quality management recruiting model is an end-to-end process of identifying, qualifying, monitoring and retaining the best temporary technology talent for its

clients.  Its recruiting process is driven by continual feedback to determine that its consultants and clients are well-served.

13.     Eliassen has invested substantial time, money and human capital identifying, among other things, Client hiring managers who have the authority to recommend or contract for the hire of outside Consultants; understanding particular timing, needs, patterns, programs, systems and projects of Clients; understanding the rates that Clients are willing to pay for engineering and technical work force (as compared to other rates and services that competitors may provide); and developing extensive good will with Clients.

14.     Eliassen Group and EGLS identify and place highly skilled engineers and technical professionals, not readily available in local markets, with corporate Clients requiring temporary skilled assistance.  In this capacity, they service thousands of Clients and Consultants. Openings for temporary employees are not typically advertised publicly, but rather are filed directly by the hiring project manager requiring immediate assistance.  Eliassen Group and EGLS discover openings and place Consultants in a company by diligent interaction with Clients and Consultants through its Account Executives and Recruiters.  Throughout their many years in business, Eliassen Group and EGLS have developed strong relationships with their  Clients and Consultants.

15.     Eliassen spends considerable time and investments in training its Recruiters to work to identify, establish, cultivate and maintain relationships with Consultants the fill the needs of Clients in these areas.  Eliassen administers personal, intensive training to its recruiters through an established program, in which recruiters gain knowledge of Eliassen's techniques of Client and Consultant relations, marketing and solicitation to potential Consultants, presentations of candidates to Client employers and cultivating and maintaining relationships with existing

Consultants.  Eliassen provides its recruiters with leads and Consultant lists, which it keeps confidential.

16.     Eliassen has generated a substantial amount of goodwill by building, cultivating, supporting, and maintaining relationships between its recruiters and its Consultants.  The goodwill is enhanced and cultivated by Eliassen's marketing, training and support.

17.     Eliassen also has spent hundreds of thousands of dollars creating and maintaining a secure computer system in order to protect confidential and proprietary information, including job requirements/listings, Consultant lists, Consultant information, Client lists, Client information, and other confidential and proprietary information, to its recruiters, account managers and management staff.

18.     In order to protect these valuable assets, and for good and valuable consideration, Eliassen requires each of its recruiters, account executives and other employees to sign a confidentiality, non-disclosure, non-competition, and non-solicitation agreement upon the commencement of their employment.  In fact, all offers of employment made to applicants are conditioned upon their signing such an agreement.  Ms. Gill and Mr. Haegle both signed agreements containing confidentiality, non-competition and non-solicitation provisions at the outset of their employment.

**(ii)     Ms. Gill's and Mr. Haegle's Employment with Eliassen**

19.     In early August 2010, Eliassen hired Ms. Gill as Director of National Accounts.

20.     On August 5, 2010, in connection with the commencement of her employment with Eliassen, Ms. Gill signed an "Agreement Governing Non-Competition Confidential Information and Trade Secrets" (the "Gill Employment Agreement") with Eliassen.  A true and accurate copy of the Employment Agreement is attached hereto as ***Exhibit A***.

21.     Relying on the Employment Agreement, Eliassen subsequently made Ms. Gill its Managing Director within its Life Sciences group.  In her role as Managing Director at EG Life Sciences, Ms. Gill represented that she was responsible for staffing in the biotech, pharmaceutical and medical device industries. In connection with her employment, Eliassen gave her extensive access to EG Life Sciences' proprietary databases containing non-public information concerning its Consultants and Clients.  Throughout her employment at Eliassen, Ms. Gill also had access to, and received, a myriad of internal confidential information belonging to Eliassen, including but not limited to client agreements, EG Life Sciences contracts, margins, pricing, compensation plans and other Eliassen internal, confidential information.

22.     In October 2016, Eliassen hired Mr. Haegle to work in its Life Sciences group.

23.     On or about October 4, 2016, in connection with the commencement of his employment with Eliassen, Mr. Haegle signed an "Agreement Governing Non-Competition Confidential Information and Trade Secrets" (the "Haegle Employment Agreement") with Eliassen.  A true and accurate copy of the Employment Agreement is attached hereto as ***Exhibit B***.

24.     Relying on the Employment Agreement, Eliassen employed Mr. Haegle within Eliassen's Life Sciences group.  In connection with his employment, Eliassen gave him extensive access to EG Life Sciences' proprietary databases containing non-public information concerning its Consultants and Clients.  Mr. Haegle was assigned pre-established Clients with which he worked to fulfill their staffing needs.

25.     Both Ms. Gill's Employment Agreement and Mr. Haegle's Employment Agreement include a restrictive covenant and/or noncompetition covenant that provides, in its entirety:

1.   **Restrictive Covenant**

For so long as Employee is employed by Eliassen and for a period of eighteen (18) months after the termination of Employee's employment for any reason whatsoever, whether voluntarily or involuntarily, Employee shall not, without prior express written consent of Eliassen, directly or indirectly, whether as an employee, officer, trustee, consultant, owner, partner, co-venturer, agent, advisor or otherwise, on behalf of any "competing organization":  1) do business with or seek business from any persons, entities or corporations approached or solicited by Employee at any time during the eighteen (18) months prior to the termination of employment with Eliassen, and/or 2) do business with or seek business from any persons, entities or corporations located in any county in which Employee approached customers or solicited business at any time during the eighteen (18) months prior to the termination of employment with Eliassen. For purposes of this agreement, a "competing organization"" shall be any business involved in the same or substantially similar business as Eliassen or which competes in any way with the business of Eliassen, either directly or indirectly as a contractor or subcontractor. Employee further acknowledges that to the extent Employee is engaged in sales and/or dealings with customers, Employee develops substantial good will on behalf of Eliassen by dealing with customers. Such customer good will is, in all instances, the property of Eliassen.  Employee further acknowledges that any solicitation of customers in violation of this agreement would be misappropriation of customer good will to the substantial detriment of Eliassen.

*See* Gill Agreement ¶ 1 (***Ex. A***); *see also* Haegle Agreement, ¶ 1 (***Ex. B***).

26.     Both the Gill Employment Agreement and the Haegle Employment Agreement

include a non-solicitation clause that provides:

2.   **Non-Solicitation**

Employee agrees that he/she shall not, for a period of eighteen (18) months from the date his/her employment with Eliassen terminates, solicit any contract or award, or accept any contract or award for work, or perform any service individually or on behalf of any competing organization, on any project that Employee worked on any time during his/her Employment with Eliassen, Employee also agrees that he/she shall not solicit, recruit to work, or employ any consultant or employee of Eliassen in any capacity whatsoever, either directly or indirectly, for a period of eighteen (18) months after the Employee leaves the employment of Eliassen.

*See* Gill Employment Agreement ¶ 2 (***Ex. A***); *see also* Haegle Employment Agreement, ¶ 2 (***Ex. B***).

27.     Both Ms. Gill's and Mr. Haegle's Employment Agreement include a non-

disclosure clause that provides:

### 3.   Non-Disclosure and Return of Confidential Information and Trade Secrets

Employee agrees that during or after the term of his/her employment with Eliassen, he shall not at any time disclose to others or use for his/her own benefit any trade secrets or confidential information pertaining to the business of Eliassen or any of its customers, representatives, agents, consultants, licensees, or affiliates.  Employee further agrees that upon termination of his/her employment with Eliassen for any reason whatsoever he/she shall immediately return to Eliassen all property and confidential information of Eliassen.  The term "confidential information," as used in this paragraph, shall include, but is not limited to, trade secrets, including all writings, notes, studies and reports prepared, compiled or acquired by Employee during the course of his/her employment; customer lists; consultant lists; pricing information; marketing techniques; documentation of business plans and opportunities; financial statements; specialized customer information concerning unique, novel or specific purchasing habits; marketing plans or projections; information relating to any special products and services that Eliassen may offer or provide to its customers or consultants from time to time; and any data or information maintained or compiled in any form, including information contained on computer disks, that is not generally known to the public.  Employee further agrees that the term "confidential information" also includes the form, method and amounts of any and all sums paid to Employee by Eliassen, and Employee agrees not to disclose any details of or about such payments to anyone inside or outside of Eliassen.

*See* Gill Employment Agreement ¶ 3 (***Ex. A***); *see also* Haegle Employment Agreement, ¶ 3 (***Ex. B***).).

28.     Both the Gill Employment Agreement and the Haegle Employment Agreement also provide for certain remedies in the case of a breach or threatened breach of their respective agreements.  Specifically, both the Gill Employment Agreement and the Haegle Employment Agreement, in part, provide:

### 4.   Remedy for Breach

In the event of a breach or threatened breach of this agreement, Eliassen shall be entitled to a preliminary and/or permanent injunction restraining such breach.  It is further agreed that, in consideration of the difficulties that accompany estimating the damage resulting from a breach of this agreement by Employee, Eliassen may, at its discretion, elect either (1) to receive the sum of $100.00 as liquidated damages for each day Employee is in breach of the agreement, or (2) to prove and recover actual damages caused by any such breach(es).  Eliassen shall further be entitled to recover all attorneys' fees and expenses reasonably incurred in establishing any breach of the agreement.  These damages, attorneys' fees and

expenses shall be in addition to, and not in lieu of, any preliminary and/or
permanent injunctive relief that may be available to Eliassen[.]

*See* Gill Employment Agreement ¶ 4 (***Ex. A***); *see* Haegle Employment Agreement, ¶ 4
(***Ex. B***).

29.    Both the Gill Employment Agreement and the Haegle Employment Agreement
also provide that Eliassen and Ms. Gill and Mr. Haegle "expressly agree that the provisions of
the [Employment Agreements] shall be construed and interpreted in accordance with the laws of
the Commonwealth of Massachusetts." *See* Gill Employment Agreement ¶ 6 (***Ex. A***); *see*
Haegle Employment Agreement, ¶ 6 (***Ex. B***).

30.    Both the Gill Employment Agreement and the Haegle Employment Agreement
also provide that the "terms and conditions of the [respective Gill and Haegle Employment
Agreements] shall survive any changes made in the future to the employment terms of employee,
including, but not limited to, changes in the salary, benefits, bonus plans, job title and job
responsibilities." *See* Gill Employment Agreement ¶ 11(***Ex. A***); *see* Haegle Employment
Agreement, ¶ 11 (***Ex. B***).

31.    Effective January 7, 2019, certain aspects of Ms. Gill's job, title and
compensation were changed by agreement with Ms. Gill.  Ms. Gill's title changed to Senior
Director, Client Services with Eliassen, as did certain job responsibilities and aspects of her
compensation package.  In connection with those changes, Ms. Gill executed on January 15,
2019, a letter agreement, dated January 14, 2019, re-affirming her obligations under her 2010
employment agreement in connection with her new job and responsibilities.  A true copy of Ms.
Gills' January 15, 2019 re-affirmation of her 2010 Employment Agreement is attached as
**_Exhibit C_**.  The compensation changes enabled Ms. Gill to make more money through an

increased direct incentive program.  Ms. Gill remained on the Eliassen leadership council until she voluntarily resigned from Eliassen.

32.     During her employment with Eliassen, Ms. Gill was privy to, and familiar with, EG Life Sciences contracts with its clients.  On January 15, 2019, Ms. Gill requested and received an Excel spreadsheet from an Eliassen colleague identifying  every job start within EG Life Sciences from November 1, 2010 through early January 2019.  This spreadsheet identified 944 job starts, including over 800 separate consultants, including extensive confidential details about each start, including among other things, each Client hiring manager, the consultants' pay rates, the bill rates charged to each Client, job titles, and each assignment's estimated end dates. There was no valid business reason for Ms. Gill to request or obtain this information.

33.     From October 2018 through January 2019, Ms. Gill and Mr. Haegle were involved in substantial, ongoing discussions with a major client of EG Life Sciences (hereinafter referred to as "*Client No. 1*") about a project to resolve a backlog of complaints involving one of *Client No. 1's* devices.

34.     On January 18, 2019, *Client No. 1* indicated to Mr. Haegle that it was ready to proceed with this "complaints project" and asked to discuss the scope of the work with EG Life Sciences.  Ms. Gill responded to Client No. 1 on the same date, January 18, 2019, by e-mail, copying Mr. Haegle, as follows:  "*That's great news.  Can we talk at 10:30 am Monday?*"

35.     Ms. Gill and Mr. Haegle continued to work with *Client No. 1* on the "complaints project" through the last week that they were employed by Eliassen. On or about January 28, 2019, Ms. Gill prepared a list of proposed temporary staff positions,  including suggested years of experience, costs and assignment duration to the EG Life Sciences client.  When *Client No. 1*

gave final approval and began to seek Consultants to staff the "complaints project", it chose to use EGLS exclusively for its staffing needs.

36.     During January 2019, Ms. Gill emailed several confidential internal Eliassen compensation plans from her Eliassen computer to her personal email account.  On January 7, 2019, Ms. Gill sent 2015 and 2017 Eliassen internal and confidential compensation plans to her personal e-mail account in two separate e-mails.  On January 25, 2019, Ms. Gill sent several EG Life Sciences compensation plans to her personal e-mail account.  There was no valid business reason for Ms. Gill to request or obtain this information.  True copies of the three January 2019 e-mails (without the attachments to them) sent by Ms. Gill from her Eliassen email to her personal e-mail account are attached as ***Exhibit D***.

37.     In connection with his work at EG Life Sciences, Mr. Haegle worked with EG Life Sciences clients to develop, maintain and cultivate consulting arrangement and other staffing relationships on behalf of EG life Sciences.  In particular, Mr. Haegle had ongoing business communications with another EG Life Sciences client (hereinafter "***Client No. 2***").  While he was employed at EG Life Sciences, Mr. Haegle had scheduled an appointment for February 6, 2019 with ***Client No. 2***.

**(iv.)    Ms. Gill and Mr. Haegle Resign from Eliassen to Jumpstart PTS Advance's Life Sciences Group**

38.     On or about February 1, 2019, Ms. Gill informed Greg Coir, Executive Vice President of Eliassen's Life Sciences group, that she was resigning from Eliassen.  Subsequently, in February, 2019, Ms. Gill changed her LinkedIn profile to indicate that she was working as Managing Director of the Life Sciences group at PTS Advance.  A true and accurate copy of Ms. Gill's LinkedIn profile is attached hereto as ***Exhibit E***.

39.    On the same day that Ms. Gill resigned, or about February 1, 2019, Mr. Haegle also resigned from EG Life Sciences.  On or about February 6, 2019, Mr. Haegle reached out to **Client No. 2** to try to reschedule the previously scheduled February 6, 2019 meeting to February 25, 2019, when he would be working with a new employer, PTS Advance.

40.    On February 7, 2019, Eliassen wrote to Mr. Haegle demanding that he cease and desist from any and all efforts on behalf of PTS Advance to seek to do business with any entities that he had approached during the last eighteen (18) months of his employment at Eliassen, and that he also cease and desist from all other activites in violation of his 2016 Agreement with Eliassen.  A true copy of the demand letter sent to Mr. Haegle is attached as **_Exhibit F_**.

41.    On February 7, 2019, Eliassen also wrote a letter to PTS Advance's CEO, Dane Groeneveld, notifying PTS Advance of Mr. Haegle's improper attempt to reschedule the meeting with **Client No. 2,** and providing PTS Advance with a copy of Mr. Haegle's employment agreement with Eliassen.  In response to Eliassen's letter to PTS Advance, Mr. Groeneveld wrote an e-mail, dated February 7, 2019, stating that he "shall investigate [the allegations] accordingly and that *"[w]e intend for Glenn to appropriately honor his commitments and will set the necessary controls in place to monitor this*."  A true copy of PTS Advance's e-mail from Mr. Groeneveld to Eliassen's Associate Counsel and General Counsel is attached as **_Exhibit G_**.

42.    On February 8, 2019, Eliassen sent a letter reminding Ms. Gill of her post-employment obligations, including the requirement to abide by the confidentiality obligations and restrictive covenants contained in her 2010 Gill Employment Agreement.  A true copy of Eliassen's February 8, 2019 notice letter to Ms. Gill is attached as **_Exhibit H_**.  On the same date, Eliassen also sent a letter to PTS Advance's CEO, Mr. Groeneveld, notifying him of Eliassen's contractual relationship with Ms. Gill, and providing PTS Advance with a copy of Ms. Gill's

2010 Employment Agreement, including the post-employment restrictive covenants, among others. A true copy of Eliassen's February 8, 2019 notice letter to PTS Advance's CEO, Dane Groeneveld, is attached as ***Exhibit I***.

43. In response to Eliassen's letter to PTS Advance, Mr. Groeneveld wrote an e-mail, dated February 8, 2019, stating, in part: "*They do not officially commence employment until the end of the month. But I will be working with my team to set out an appropriate program to manage this*." A true copy of Mr. Groeneveld's February 8, 2019 e-mail is attached as ***Exhibit J***.

44. In the press release announcing the appointment of Ms. Gill as Managing Director of PTS Advance's life sciences division, Ms. Gill was quoted as follows: "*It is a truly unique opportunity to join the Leadership Team at PTS Advance and **combine my** passion, knowledge and **network across the Life Sciences industry** with the vision and execution track record that Dane Groeneveld and the Stein Family have set in this industry*." A true copy of the Press Release is attached as ***Exhibit K*** (emphasis added).

45. On February 22, 2019, Eliassen followed up on the PTS Advance press release with an e-mail to PTS Advance's Mr. Groeneveld stating, in part: "*Now that Jayne Gill and Glenn Haegle have commenced their employment with PTS Advance, we would like to discuss putting together written agreements detailing the scope of the restrictions on Ms. Gill's and Mr. Haegle's activities with respect to Eliassen clients, employees and confidential information*." In response to this February 22, 2019 e-mail, Mr. Groeneveld replied: "*We have no intention of them breaking any of the legally binding terms of their agreements, and we have been working on a market plan to ensure that we monitor activity appropriately. . . . So I do not see any value in spending time and money with lawyers to put anything additional in place*." A true copy of

the e-mail thread, dated February 22, 2019, by and between Eliassen and PTS Advance's CEO, Mr. Groeneveld, is attached as ***Exhibit L***.

46.     On information and belief, PTS Advance hired Ms. Gill and Mr. Haegle in order to set up and jumpstart PTS Advances' Life Sciences group based on the knowledge and proprietary and confidential information Ms. Gill and Mr. Haegle obtained during their employment with Eliassen.

47.     On information and belief, on or about February 28, 2019, an EG Life Sciences consultant on assignment(M**** B****)("***EGLS Consultant No. 1***") with another EGLS client was contacted by a PTS Advance recruiter about a complaint project with EGLS ***Client No. 1***. The PTS recruiter is reported to have informed the EGLS consultant on assignment elsewhere that this was not the type of project or position that he had worked on in the past. ***EGLS Consultant No. 1*** was a person known to Ms. Gill, both because she was listed on the spreadsheet of all EGLS starts since 2010 that Ms. Gill obtained shortly before quitting her job at Eliassen, and because in July 2017, an EG Life Sciences recruiter had sent ***EGLS Consultant No. 1's*** resume to Ms. Gill as a possible candidate for placement on another "complaints project."

48.     On information and belief, while employed by PTS Advance, Ms. Gill also passed on information concerning another EGLS consultant (A****** G****)("***EGLS Consultant No. 2***"), who was on assignment at ***Client No. 1***, to another PTS Advance recruiter. ***EGLS Consultant No. 2***. reported that a PTS Advance recruiter had called him at the suggestion of Ms. Gill.

49.     On or prior to March 11, 2019, Mr. Haegle made a phone call to an entity affiliated with ***Client No. 1*** (**"*Affiliate of Client No. 1*"),** which is also a client of Eliassen and

EG Life Sciences in violation of his non-solicitation covenant.  In connection with his work within the last eighteen months at Eliassen, Mr. Haegle had prior business dealings with the *Affiliate of Client No. 1* and the manager he recently contacted.  The contact at the *Affiliate of Client No. 1* responded to Mr. Haegle by sending an e-mail to Mr. Haegle's former e-mail account at Eliassen.  On or about March 12, 2019, Mr. Haegle also spoke by telephone with the client contact at the *Affiliate of Client No. 1* thereby demonstrating that the client contact at the *Affiliate of Client No. 1* knew of Mr. Haegle through his work on behalf of Eliassen and that Mr. Haegle identified that he had left Eliassen and identified his current employer, on information and belief, in order to trade on and use Eliassen's good will for the benefit of a competitor, PTS Advance.

50.     The PTS Advance's Life Sciences group provides services to the same segments of the Life Sciences industry served by EG Life Sciences.  EG Life Sciences and PTS Advance Life Sciences are market competitors.

51.     As demonstrated by the past conduct of both Ms. Gill and Mr. Haegle in violation of their respective covenants and obligations owed to Eliassen and EG Life Sciences, there is a real and substantial risk that Ms. Gill and Mr. Haegle's employment will jumpstart PTS Advance's Life Sciences group utilizing Eliassen's confidential and proprietary business information.

52.     Ms. Gill and Mr. Haegle will suffer no hardship from being required to abide by the restrictive covenants set forth in their respective Employment Agreements.

## COUNT I
### Breach of Employment Agreement Against Ms. Gill

53.     Eliassen and EG Life Sciences repeat and re-allege the allegations set forth in the preceding paragraphs.

54.     Ms. Gill voluntarily entered into an Employment Agreement with Eliassen, in which she voluntarily entered into certain restrictive covenants, including non-disclosure, noncompetition and non-solicitation covenants, in connection with her employment with Eliassen.  The Plaintiffs have legitimate business interests, including their good will and confidential information, to protect by means of the Gill Employment Agreement, which was re-affirmed by Ms. Gill less than three weeks before she voluntarily terminated her employment at Eliassen.

55.     As demonstrated by the above acts of Ms. Gill soliciting, directly or indirectly, Eliassen and EG Life Sciences' clients, including Client No. 1, and Eliassen/EG Life Sciences' consultants, Ms. Gill has already breached her Gill Employment Agreement with Eliassen, including, but not limited to, her non-solicitation covenant and her non-disclosure covenant, among others.

56.     In her position as Managing Director of the Life Sciences group at PTS Advance, and in the absence of an injunction preventing her from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenants, Ms. Gill has used and likely will continue to use Eliassen confidential and proprietary information to jumpstart PTS Advance's Life Sciences group, in violation of the non-disclosure provisions of her Employment Agreement.

57.     In her position as Managing Director of the PTS Advance Life Sciences group, and in the absence of an injunction preventing her from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenants, Ms. Gill has entered employment in a business that directly competes with Eliassen's business in the United States, in breach of her Employment Agreement.

58.     On information and belief, including the contact by a PTS Advance recruiter on a project that was exclusive to EG Life Sciences detailed above, and in the absence of an injunction preventing her from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenants, Ms. Gill will interfere, directly or indirectly, with the business relations of Eliassen, in breach of her Employment Agreement.

59.     In her position as Managing Director of PTS Advance's Life Sciences group, and in the absence of an injunction preventing her from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenant, Ms. Gill will seek to provide services, directly or indirectly, to Eliassen clients to whom she has personally provided services within the last eighteen months preceding her resignation from Eliassen on behalf of a competing organization, in breach of her Employment Agreement.

60.     In her position as Managing Director of PTS Advance's Life Sciences group, and in the absence of an injunction preventing her from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenant, Ms. Gill will seek business, directly or indirectly, from persons and corporations located in counties in which she solicited business during the eighteen months preceding her resignation from Eliassen on behalf of a competing organization, in breach of her Employment Agreement.

61.     In the absence of an injunction restraining Ms. Gill from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenants, if she is permitted to work as Managing Director of the PTS Advance's Life Sciences group, there is a substantial risk that Ms. Gill will solicit, directly or indirectly, current Eliassen customers and clients, as well as prospective Eliassen clients with whom Ms. Gill was involved in soliciting in the eighteen months preceding her resignation, in violation of her Employment Agreement.

62.     In the absence of an injunction restraining Ms. Gill from violating her restrictive covenants, including her non-disclosure, noncompetition and non-solicitation covenants, if she is permitted to work as Managing Director of PTS Advance's Life Sciences group, there is a substantial risk that Ms. Gill will interfere, directly or indirectly, with Eliassen's business relationships with its customers and clients, in violation of her Employment Agreement.

63.     Eliassen has suffered, and continues to suffer, irreparable harm, including harm to Eliassen's good will, as well as damages and attorneys' fees as a consequence of Ms. Gill's breach of the restrictive covenants in her Employment Agreement.

64.     Based on Ms. Gill's breaches of contract described above, Eliassen is entitled to immediate, preliminary and permanent injunctive relief and all appropriate damages against her.

## COUNT II
### Breach of Common Law Confidentiality Against Ms. Gill

65.     Eliassen and EG Life Sciences repeat and re-allege the allegations set forth in the preceding paragraphs.

66.     Eliassen and EGLS take extensive measure to protect internal confidential information for the benefit of Eliassen and EGLS.  The extensive measures include, but are not limited to, password protected access to various internal confidential information; substantial investment in the internal systems to protect Eliassen and EGLS confidential information, including the development of an internal database of EGLS clients containing confidential and proprietary information on EGLS clients and consultants, pricing information, assignment information, hiring managers, particular requirements of clients and consultants and other information obtained by Eliassen and EGLS for the benefit of Eliassen and EGLS.

67.     Eliassen, and its related company EGLS, have spent millions of dollars and substantial time and effort over many years to develop, maintain, cultivate and retain Eliassen

good will relationships and confidential information, including, but not limited to, substantial

expenditures of time and money on Eliassen and EGLS's internal computers, software systems,

servers and other technology that hosts and maintains Eliassen's internal confidential

information as well as substantial amounts of time and money training, recruiting and

maintaining its internal sales team and time, money and effort building client relationships at

Eliassen and EG Life Sciences.  Eliassen and EGLS internal confidential information is not

accessible by those persons not employed by Eliassen and/or EGLS and/or its owners and

investors.  The Eliassen and EGLS confidential information and their good will are valuable to

Eliassen and EGLS.  It would be extremely difficult, if not impossible, for others to properly

acquire or duplicate Eliassen and EGLS's internal confidential information and client good will

relationships.

68.     As more fully detailed above, Ms. Gill's use of Eliassen and/or EGLS confidential

information and good will for the benefit of a competitor is a material breach of her contractual

and common law confidentiality obligations.

69.     Eliassen has suffered, and continues to suffer, irreparable harm, as well as

damages and attorneys' fees as a consequence of Ms. Gill's breach of her contractual non-

disclosure and common law confidentiality obligations.  As more fully detailed above, Ms. Gill's

use and disclosure of Eliassen and EGLS's internal confidential information has caused and, if

not enjoined, will continue to cause ongoing and irreparable harm to Eliassen and EGLS's

business.

70.     Based on Ms. Gill's breaches of contract described above, Eliassen is entitled to

immediate, preliminary and permanent injunctive relief and all appropriate damages against her.

**COUNT III**
**Violation of the Defend Trade Secrets Act**
**of 2016-18 U.S.C. § 1836(b)(1) against Ms. Gill**

71.     Eliassen and EG Life Sciences repeat and re-allege the allegations set forth in the preceding paragraphs.

72.     The Defend Trade Secrets Act ("DTSA"), Pub. L. No. 114-153, 130 Stat. 376, which was signed into law on May 11, 2016, specifically allows a private right of action for misappropriation of trade secrets. Eliassen and EG Life Sciences are owners of trade secrets, as defined by the DTSA, which have been willfully misappropriated by Ms. Gill. A person misappropriates a trade secret by, among other things, the acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means, or by using a trade secret of a person without express or implied consent by the other person who used improper means to acquire knowledge of the trade secret.

73.     Eliassen Group and EG Life Sciences took and continues to undertake extensive affirmative measures to keep its confidential and proprietary information and trade secrets, specifically its internal compensation structure, secret. Ms. Gill accepted Eliassen's offer of employment, which was expressly conditioned upon Ms. Gill's signing the Employment Agreement containing restrictive covenants concerning Eliassen's  trade secrets and confidential information Ms. Gill had access to Eliassen's trade secrets during the course of her employment at Eliassen and subsequently disclosed Eliassen's protected trade secret information concerning several Eliassen clients and consultants .

74.     Ms. Gill violated DTSA by using her computer access to Eliassen's computers to download Eliassen trade secrets and confidential and proprietary information belonging to Eliassen to her personal computer without a legitimate business justification on Eliassen's behalf

when she did so.  The trade secrets misappropriated by Ms. Gill relate to a service used in, or intended for use in, interstate commerce.  The materials misappropriated by Ms. Gill and not returned by her to the Plaintiffs are internal and proprietary business documents that are part of Eliassen's trade secrets that the Plaintiffs use with its sales staff which is involved in the conduct of its interstate commercial business.

75.     The Plaintiffs have no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets and confidential information by Ms. Gill. Injunctive relief is, therefore, necessary and appropriate to restrain the illegal misappropriation and use of such trade secrets and confidential information pursuant to the DTSA.

76.     Unless Ms. Gill is restrained and enjoined from using Eliassen's trade secrets and confidential information, which she illicitly obtained through her own misappropriation and her tortious interference with Plaintiffs' contractual relations with Gill detailed above, Plaintiffs will suffer immediate and irreparable injury as Ms. Gill will continue to have the unfettered ability to make use of such trade secrets and confidential information.

77.     As a direct and proximate result of Ms. Gill's misappropriation of Plaintiffs' trade secrets and confidential information, Eliassen and EG Life Sciences have suffered damages in an amount yet to be determined.  Pursuant to DTSA, Plaintiffs are entitled to recover damages.  By reason of Ms. Gill's willful and malicious acts, Plaintiffs are entitled to an award of exemplary damages from Ms. Gill in such amounts as is necessary to punish her and deter her from the commission of like acts.  The Court should also award Plantiffs their reasonable attorneys' fees pursuant to DTSA.

## COUNT IV
### Breach of Employment Agreement against Mr. Haegle

78.      Eliassen and EG Life Sciences repeat and re-allege the allegations set forth in the preceding paragraphs.

79.      Mr. Haegle voluntarily entered into the Haegle Employment Agreement with Eliassen, in which he voluntarily entered into certain restrictive covenants, including non-disclosure, noncompetition, and non-solicitation covenants, in connection with his employment with Eliassen.  The Plaintiffs have legitimate business interests, including their good will and confidential information, to protect by means of the Haegle Employment Agreement.

80.      As demonstrated by the above acts of Mr. Haegle contacting and, on information and belief, soliciting or attempting to solicit, directly or indirectly,  *Client No. 2* and the *Affiliate of Client No. 1*, Mr. Haegle has already breached his Haegle Employment Agreement with Eliassen, including, but not limited to, his non-solicitation covenant and his non-disclosure covenant, among others.

81.      In the absence of an injunction preventing him from violating his restrictive covenants, including his non-disclosure, noncompetition and non-solicitation covenants, Mr. Haegle has used and likely will continue to use Eliassen confidential and proprietary information to jumpstart PTS Advance's Life Sciences group, in violation of the non-disclosure provisions of his Employment Agreement.

82.      In the absence of an injunction preventing him from violating his restrictive covenants, including his non-disclosure, noncompetition and non-solicitation covenant, Mr. Haegle will seek to provide, directly or indirectly, services to Eliassen clients to whom he has

personally provided services within the last eighteen months preceding his resignation from Eliassen on behalf of a competing organization, in breach of his Employment Agreement.

83.    In the absence of an injunction preventing him from violating his restrictive covenants, including his non-disclosure, noncompetition and non-solicitation covenant, Mr. Haegle will seek business, directly or indirectly, from persons and corporations located in counties in which he solicited business during the eighteen months preceding his resignation from Eliassen on behalf of a competing organization, in breach of his Employment Agreement.

84.    Given his conduct detailed above, and in the absence of an injunction restraining Mr. Haegle from violating his restrictive covenants, including his non-disclosure, noncompetition and non-solicitation covenants, if he is permitted to work in PTS Advance's Life Sciences group, there is a substantial risk that Mr. Haegle will continue to solicit, directly or indirectly, current Eliassen customers and clients, as well as prospective Eliassen clients with whom Mr. Haegle was involved in soliciting in the eighteen months preceding his resignation, in violation of his Employment Agreement.

85.    Given his conduct detailed above, and in the absence of an injunction restraining Mr. Haegle from violating his restrictive covenants, including his non-disclosure, noncompetition and non-solicitation covenants, if he is permitted to work in PTS Advance's Life Sciences group, there is a substantial risk that Mr. Haegle will interfere, directly or indirectly with Eliassen's business relationships with its customers and clients, in violation of his Employment Agreement.

86.    Eliassen has suffered, and continues to suffer, irreparable harm, including harm to Eliassen's good will, as well as damages and attorneys' fees as a consequence of Mr. Haegle's breach of the restrictive covenants in his Employment Agreement.

87.     Based on Mr. Haegle's breaches of contract described above, Eliassen is entitled to immediate, preliminary and permanent injunctive relief and all appropriate damages against him.

### COUNT V
### Violation of the Defend Trade Secrets Act
### of 2016-18 U.S.C. § 1836(b)(1) against Ms. Gill

88.     Eliassen and EG Life Sciences repeat and re-allege the allegations set forth in the preceding paragraphs.

89.     During Mr. Haegle's employment with Eliassen, Mr. Haegle was given and had access to Plaintiffs' trade secrets and/or confidential and proprietary information, including, but not limited to, the client lists and their detailed profiles.

90.     In violation of the Defend Trade Secrets Act,  Mr. Haegle has misappropriated Plaintiffs' trade secrets and has used this information for his own benefit and to the detriment of Eliassen and EG Life Sciences, without their consent and knowing that such information constituted trade secrets and proprietary information of Eliassen and/or EG Life Sciences, and knowing that Mr. Haegle had acquired knowledge of such trade secrets and proprietary information under circumstances giving rise to a duty to maintain their secrecy and/or limit their use for the benefit of Eliassen and/or EG Life Sciences.

91.     The Plaintiffs have been damaged and will continue to be damaged by Mr. Haegle's willful and malicious misappropriation and use of Eliassen and EG Life Sciences' proprietary property and the wrongful solicitation of those same clients contained therein.

92.     Based on Mr. Haegle's violations described above, Eliassen is entitled to immediate, preliminary and permanent injunctive relief and all appropriate compensatory and damages against him.

**WHEREFORE**, Eliassen respectfully requests that this Court:

A.      Enter judgment for Eliassen on Counts I, II, III, IV and V of the Verified

Complaint;

B.      Award monetary damages and attorneys' fees to Eliassen in an amount to be

proved at trial under Counts I, II, III, IV, and V of the Verified Complaint;

C.      In accordance with Section 1 of her Employment Agreement, and the claims

asserted against her in Counts I, II and III, enter a temporary, preliminary and/or

permanent injunction enjoining Ms. Gill from working in the Life Sciences group

at PTS Advance;

D.      In accordance with Section 2 of her Employment Agreement, and the claims

asserted against her in Counts I, II and III, enter a temporary, preliminary and/or

permanent injunction enjoining Ms. Gill from soliciting, hiring, or engaging,

directly or indirectly, any Eliassen clients or customers.

E.       In accordance with Section 2 of her Employment Agreement, and the claims

asserted against her in Counts I, II and III, enter a temporary, preliminary and/or

permanent injunction enjoining Ms. Gill from soliciting, hiring, engaging, or

otherwise interfering with Eliassen's business relationship with any person who is,

or was within the year prior to his resignation, engaged as a consultant or

employed by Eliassen.

F.      In accordance with Section 2 of her Employment Agreement, and the claims

asserted against her in Counts I, II and III, enter a temporary, preliminary and/or

permanent injunction enjoining Ms. Gill from soliciting or otherwise interfering

with Eliassen's business relationships with any Eliassen customer or client.

G.      In accordance with Section 1 of her Employment Agreement, and the claims asserted against her in Counts I, II and III, enter a temporary, preliminary and/or permanent injunction enjoining Ms. Gill from doing business with, seeking to do business, or interfering with Eliassen's relationship with any Eliassen prospective client or customer with whom Ms. Gill was involved in soliciting during the last eighteen months of her employment with Eliassen.

H.      In accordance with Section 1 of her Employment Agreement, and the claims asserted against her in Counts I, II and III, enter a temporary, preliminary and/or permanent injunction enjoining Ms. Gill from doing business or seeking business from any person or entity located in any county in which Ms. Gill approached customers or solicited business during the last eighteen months of her employment with Eliassen.

I.      Award exemplary and punitive damages and award the Plaintiffs their reasonable attorneys' fees and costs under Count III against Ms. Gill in an amount to be determined at trial against Ms. Gill;

J.      In accordance with Section 1 of his Employment Agreement, and the claims asserted against him in Counts IV and V, enter a temporary, preliminary and/or permanent injunction enjoining enjoin Mr Haegle from working in the Life Sciences group at PTS Advance;

K.      In accordance with Section 2 of his Employment Agreement, and the claims asserted against him in Counts IV and V, and the claims asserted against him in Counts IV and V, enter a temporary, preliminary and/or permanent injunction enjoining enter a temporary, preliminary and/or permanent injunction enjoining

enjoin Mr. Haegle from, directly or indirectly, soliciting, hiring, or engaging any Eliassen and/or EGLS's clients or customers;

L.    Award exemplary and punitive damages and award the Plaintiffs their reasonable attorneys' fees and costs under Count V against Mr. Haegle in an amount to be determined at trial against Mr. Haegle;

M.    In accordance with Section 3 of their respective Employment Agreements, and their statutory and common law confidentiality obligations, and the claims asserted against them in Counts I, II III, IV and V, enter a temporary, preliminary and/or permanent injunction enjoining Ms. Gill and Mr. Haegle from making any use of Eliassen and EGLS's proprietary information, trade secrets, and/or confidential information;

N.    In accordance with Section 3 of their respective Employment Agreements, Order Ms. Gill and Mr. Haegle, and the claims asserted against them in Counts I and IV, within 24 hours of the Court's Order, to return all documents containing Eliassen and /or EGLS confidential information to Eliassen and EGLS;

O.    Order Ms. Gill and Mr. Haegle to preserve, pending further Order of this Court, all electronic evidence, e-mails, attachments, and photographs of all Eliassen information and materials sent or received by Ms. Gill and Mr. Haegle from any source, including any personal or company email address, or otherwise taken, removed, obtained and/or procured from anyone, including without limitation current and former Eliassen employees or consultants and Eliassen clients;

P.    Enjoin Ms. Gill and Mr. Haegle from any further violations of the restrictive covenants in their respective Employment Agreements.

Q.     Enjoin PTS Advance from employing Ms. Gill and Mr. Haegle in a manner not

        consistent with the restrictive covenants in Ms. Gill's Employment Agreement

        and Mr. Haegle's Employment Agreement with Eliassen.

R.     Award Eliassen its costs and statutory interest incurred in connection with this

        action.

S.     Award Eliassen such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all claims so triable.

**ELIASSEN GROUP, LLC and
EG LIFE SCIENCES LLC**

By their attorneys,


/s/  Christopher R. O'Hara
Christopher R. O'Hara (BBO # 548611)
cohara@toddweld.com
Suzanne Elovecky (BBO # 670047)
selovecky@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated:  March 13, 2019

## VERIFICATION

I, Greg Coir, am the Executive Vice President of EG Life Sciences, LLC and am an employee of Eliassen Group, LLC. I have read the foregoing Verified Complaint and Jury Demand and, believe the allegations to be true and accurate to the best of my knowledge, information and belief and based upon documents reasonably available to Eliassen Group, LLC and EG Life Sciences, LLC, and accordingly, verify the complaint on behalf of Eliassen Group, LLC and EG Life Sciences, LLC.

Greg Coir
Executive Vice President
Eliassen Group, LLC
EG Life Sciences, LLC
55 Walkers Brook Drive, 6th Floor
Reading, MA 01867

Dated: March 13, 2019